645 A.2d 413

**EMPIRE SANITARY LANDFILL, INC. and Danella Environmental Technologies, Inc., Petitioners,**

v.

**COMMONWEALTH of PENNSYLVANIA, DEPARTMENT of ENVIRONMENTAL RESOURCES, Lehigh County, The Lehigh County Department of Planning and Development, Office of Solid Waste Management et al., Respondents.**

Commonwealth Court of Pennsylvania.

Argued Feb. 3, 1994.

Decided June 30, 1994.

444

Charles Bowser, for petitioners.

Alexander E. Stein, for respondents.

Before CRAIG, President Judge, and NEWMAN, J., and LORD, Senior Judge.

CRAIG, President Judge.

The petitioners, Empire Sanitary Landfill and Danella Environmental Technologies (Empire), have filed a motion for

summary judgment, and the respondent Department of Environmental Resources (DER) has filed a cross-motion for summary judgment, in which the other respondents, Lehigh County and its Office of Solid Waste Management, have joined.

As in any motion for summary judgment, the facts described below are based upon the parties' pleadings, affidavits and depositions, viewing the facts in the light most favorable to the non-moving party. A court may grant a motion for summary judgment only where no material issue of fact remains, and the party seeking summary judgment is entitled to judgment as a matter of law. *Giddings v. Tartler,* 130 Pa.Commonwealth Ct. 175, 567 A.2d 766 (1989).

## HISTORY

This dispute arises under the Municipal Waste Planning, Recycling and Waste Reduction Act, Act of July 28, 1988, P.L. 556, 53 P.S. §§ 4000.101–4000.1904 (Act). Empire is seeking both declaratory and injunctive relief in its petition for review. Specifically, Empire seeks a declaratory judgment (1) that section 303(e) of Act 101, 53 P.S. § 4000.303(e), Lehigh County's waste management plan flow control provisions, and the county's flow control ordinances and regulations are unconstitutional under the Commerce Clause of the United States Constitution, (2) that, under section 502(c) and (o), of the Act, 53 P.S. § 4000.502(c), Empire constitutes an existing facility, (3) that the Empire–Danella contract is protected under section 506(a) of the Act, 53 P.S. § 4000.506(a), and (4) that contracts for the collection, transportation and disposal of waste entered into before the county sought to implement its plan through the adoption of its waste control ordinance, are preexisting contracts protected under section 506(a).

DER has provided in its brief the following helpful chronology of significant dates, including those relating to the contract under which Danella transfers waste to Empire for disposal:

| | |
|---|---|
| September 26, 1988 | Effective date of the Act |
| December 6, 1988 | Execution of Empire/Danella Disposal Agreement, with original term ending on December 6, 1993 |

| 1989–Present | Initiation of Danella's collection agreements with its customers |
| December 1, 1989 | Execution of amended Empire/Danella Disposal Agreement, extending original term until December 1, 1994, with two ten-year renewal periods |
| April 24, 1991 | Lehigh County's formal adoption of the Lehigh County Plan |
| February 14, 1992 | DER approval of Lehigh County Plan |
| June 1, 1992 | Lehigh County Ordinance effective date, implementing Lehigh County Plan |

Empire also seeks permanent injunctive relief enjoining DER and the county from interfering with the performance of Empire and Danella under the contracts, and from interfering with the design, construction, operation, financing and contractual obligations of Empire's landfill.

DER's motion for summary judgment also seeks declaratory and injunctive relief relating to the Empire–Danella contracts. One of the grounds upon which DER seeks summary judgment is jurisdictional. DER asserts that Empire and Danella are precluded from raising issues challenging the plan because the proper forum to litigate those issues is the Environmental Hearing Board (EHB), in an appeal from DER's approval of the county's waste management plan.

## ANALYSIS

### 1. Validity of County Plan

 This court agrees with DER's jurisdictional position with regard to Empire's challenges to the county's plan and its constitutional claims relating to the Act. In *Greene County Citizens United v. Greene County Solid Waste Authority*, 161 Pa.Commonwealth Ct. 372, 636 A.2d 1299 (1994), this court concluded that the Environmental Hearing Board has sole jurisdiction over challenges to county plans approved by DER. In this case, Empire and Danella are attempting to challenge provisions in the county plan that they should have challenged

by an appeal of DER's plan approval to the Environmental Hearing Board.

However, although Empire and Danella cannot here seek to challenge the plan as adopted and approved by DER, they are not foreclosed from challenging the county's waste-flow ordinances, which preclude the transportation of county-generated waste to non-designated landfills, because, although the plan incorporated the ordinances, the ordinance is an enactment of the county and the EHB does not have jurisdiction over substantive challenges to the validity of a county-enacted ordinance. Also, this court has jurisdiction over challenges to the ordinances because Empire is asserting that the ordinance is facially unconstitutional and thus is raising a substantial constitutional question. *See Cherry v. City of Philadelphia*, 160 Pa.Commonwealth Ct. 179, 634 A.2d 754 (1993). Hence, declaratory judgment is available to review the constitutionality of the county's ordinances.

## 2. Validity of the County's Ordinances Under the Commerce Clause

The purpose of the waste flow control ordinance is stated in the county plan summary as follows:

Assurance of disposal is provided by ten year disposal contracts with each of the contractors [disposal facilities] which stipulate a fixed initial price per ton ... and a fixed annual escalator. Although the disposal contracts each provide that Lehigh County will use reasonable efforts to cause delivery to each contractor of the waste generated within the contractor's region, the contracts are not "put or pay" in that the delivery of specified tonnage is not required. *The three contractors will be assured through the County's enforcement of its waste flow control ordinance* that they will receive the approximate amount of waste they are entitled to receive under the disposal contracts.

The plan does not seek to alter the County's existing municipal waste collection and hauling system which in large part utilizes private haulers ...

Additionally, *Lehigh County's Waste Flow Control Ordinance and the County's Waste Rules and Regulations will become effective upon approval of this plan and will provide effective enforcement mechanisms.*

Emphasis added.

The waste-flow control ordinance provisions relevant to this case state as follows:

Section 4. *Waste Flow Control; Designated Facilities.*

(a) All Regulated Waste produced, collected and transported from within the jurisdictional limits of any Municipality within the County shall be transported and delivered to a Facility then designated by the County, pursuant to any currently effective Plan, as a Facility authorized and empowered to accept such delivery from within such Municipality. A Facility so designated for a Municipality shall be a Designated Facility for such Municipality.

(b) It shall be unlawful for any Person to transport or deliver, or cause to be transported or delivered, to other than a Designated Facility for a Municipality, any Regulated Waste produced, collected, and transported from within such Municipality, unless such transport or delivery is expressly provided for in the Plan then effective.

Of course, in Pennsylvania, every part of the county is within the boundaries of a municipality.

■ One of DER's arguments is that this court should not conclude that the ordinance violates the Commerce Clause because such a result would place in question other contracts the state and its subdivisions enter into with state businesses, such as contracts for school books and equipment. In such examples, DER argues, the Commerce Clause should not be a constraint as long as the bidding process does not exclude out-of-state businesses. Although DER does not rely on a specific line of cases that addresses government action involving the awarding of contracts, the United States Supreme Court and some federal courts have considered the circumstances under which states and local subdivisions may engage in activities that involve commerce without violating the Commerce

Clause. The principle developed in those cases is known as the market participant doctrine. Under that doctrine, when a state or governmental entity is a market participant rather than a market regulator, the Commerce Clause is not applicable.

In the context of governmental awards of contracts, the federal courts have applied the market participant doctrine in addressing challenges to governmental regulations that provided local businesses with preferences, even though the successful bidder was not the low bidder.

In *J.F. Shea Co., Inc. v. City of Chicago*, 992 F.2d 745 (7th Cir.1993), the court relied on the Supreme Court's decision in *White v. Massachusetts Council Constr. Employers, Inc.*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), in which that Court held that the City of Boston had acted as a market participant in seeking contract proposals, and therefore properly could require, as a condition to the awarding of contracts funded by the city, that the contracts be performed by a workforce consisting of at least fifty percent Boston residents.

The significant factor in *J.F. Shea* was the governmental unit's status as a party to the contract. The court, citing *Reeves, Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980), stated that, "[w]hen acting as a proprietor, a government shares the same freedom from the Commerce Clause that private parties enjoy." 992 F.2d at 749.

In *W.C.M. Window Co., Inc. v. Bernardi*, 730 F.2d 486 (7th Cir.1984), the court of appeals held that an Illinois law, which required that contractors on any public works project or improvement for a state or political subdivision employ only residents of the state, unless the contractor certified either that such workers are unavailable or incapable of performing the work, violated the Commerce Clause.

That court distinguished *White* by noting that the Illinois law violated the Commerce Clause because it applied to all public construction contracts, not only those to which the state was a party, e.g., contracts of local governmental units or officials such as school boards and dogcatchers.

In *Swin Resource Systems v. Lycoming County,* 883 F.2d 245 (3rd Cir.1989), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990), the Court of Appeals for the Third Circuit concluded that Lycoming County, by virtue of its status as an operator of a landfill, was a market participant, and hence, its regulations, which gave county residents preference in the use of the county-operated landfill, did not violate the Commerce Clause.

However, in *Waste Recycling v. S.E. Ala. Solid Waste Disposal,* 814 F.Supp. 1566 (M.D.Ala.1993), a federal district court considered a challenge to three municipal ordinances that governed the collection and disposal of solid waste in a four-county region in southeastern Alabama. Several disposal companies asserted that the ordinances violated the Commerce Clause.

Specifically, in that case, thirty-six local municipalities named three cities as representatives in a suit initiated against the Southeast Alabama Solid Waste Disposal Authority, which was seeking to build a solid waste disposal facility for the municipalities. The municipalities had either signed contracts with the Authority, or intended to sign contracts, which would require the municipalities to enact laws relating to the disposal of solid waste generated within the municipalities.

The Authority was a public non-profit corporation, formed by the four counties and the local municipalities within those counties, under a state enabling statute. The Authority planned to construct a waste disposal facility and three waste disposal transfer stations for the use of the municipal entities, which were to be funded by revenue bonds secured by pledges of income received by the Authority and income collected for use of the proposed facility.

The three named representative cities signed contracts with the Authority to use the Authority's solid waste disposal services. As part of the contractual agreement, the cities were required to enact flow control ordinances mandating that all waste collected in the cities by private or public haulers be disposed of only at the Authority's facility.

The cities defended their ordinances by raising the market participant doctrine. The district court rejected that argument, concluding that the ordinances clearly constituted regulation of, rather than participation in, the market. 814 F.Supp. at 1571.

The court examined the contracts and implementing ordinances, and, noting that the ordinances were regulatory in nature, recognized that the city-contracting-parties could implement the contractual provisions only by exercising the power to regulate they possess as sovereigns. Private participants would not be able to implement such provisions.

■ The present case is similar. Although Lehigh County did not apparently engage in a bidding process that excluded out-of-state landfills, the county could not implement the provisions of its contracts with the designated landfills without adopting the county ordinances at issue. Hence, the county, in entering into the contracts with the designated landfills, and adopting its flow control ordinances, is not acting solely as a market participant, but is acting as a regulator.

As in *Waste Recycling*, the ordinances at issue here were adopted in order to ensure that entities not parties to the county-landfill contract—i.e., haulers, other landfills, and generators of solid waste—would nevertheless be subject to that contract. Accordingly, the county here has acted as a market regulator rather than a market participant. Therefore, the market participant doctrine does not apply in this case, and this court must proceed to review the validity of the county's ordinance under the Commerce Clause.

The Supreme Court has recognized that the hauling and disposal of solid waste implicates Commerce Clause concerns. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978). Furthermore, regulations that preclude the transportation of articles of commerce out-of-state are also subject to review under Commerce Clause analysis. *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979).

In *Hughes* the Supreme Court relied upon its decision in *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), in which the Court directed that, when reviewing Commerce Clause challenges, courts must first inquire as to

(1) whether the challenged statute regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce.

■ The Supreme Court has stated that, when a regulation discriminates against interstate commerce, the regulation will be deemed invalid unless the governmental entity defending the regulation establishes that the regulation advances a legitimate public purpose and there are no nondiscriminatory alternatives available which adequately serve the local interests at stake. *Oregon Waste Systems, Inc. v. Dept. of Environmental Quality,* —— U.S. ——, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994).

■ In this case, as indicated above, Empire is precluded from challenging the facially discriminatory landfill designation in the plan. The waste-flow ordinance the county adopted, *by itself,* does not discriminate against interstate commerce; however, the ordinance does have an incidental effect on interstate commerce by precluding, in application, the transportation of waste out-of-state.

Until recently, the United States Supreme Court has not squarely addressed a Commerce Clause challenge to flow-control ordinances such as the one at issue. However, in the recent case of *C & A Carbone v. Town of Clarkstown, New York,* —— U.S. ——, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), the Court addressed a flow control ordinance Clarkstown adopted to implement a waste flow guarantee the town entered with a private contractor who agreed to construct a solid waste transfer station to separate recyclable from nonrecyclable waste and operate the station for five years.

Under the agreement, the town would guarantee a minimum waste flow to the facility, and the contractor would charge haulers a tipping fee that exceeded the cost of disposal for non-sorted waste in the private market. The Court held that the ordinance violated the Commerce Clause.

The Court stated:

While the immediate effect of the ordinance is to direct local transport of solid waste to a designated site within the local jurisdiction, its economic effects are interstate in reach ... Furthermore, even as to waste originant in Clarkstown, the ordinance prevents everyone except the favored local operator from performing the initial processing step. The ordinance thus deprives out-of-state businesses of access to a local market. These economic effects are more than enough to bring the Clarkstown ordinance within the purview of the Commerce Clause.

—— U.S. at ——, 114 S.Ct. at 1679.

The Court noted that the real "article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it." —— U.S. at ——, 114 S.Ct. at 1682.

As in *Hughes*, the Court recognized that the Commerce Clause analysis to be applied in a specific case depends on whether a regulation facially discriminates against interstate commerce, as in *Philadelphia v. New Jersey*, or whether an ordinance imposes a burden on interstate commerce, the "incidental effect" rationale applied in *Pike v. Bruce Church*.

In *C & A Carbone*, the court concluded that, with respect to the "stream of commerce" at issue, i.e., the processing and disposal service,

the flow control ordinance discriminates, for it allows only the favored operator to process waste that is within the limits of the town. The ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition. [—— U.S. at ——, 114 S.Ct. at 1683].

The ordinance at issue here cannot be said to be facially discriminatory, because it does not specifically state that county-generated waste must only be disposed of at a facility

within the county or state. However, as indicated above, the ordinance does have an incidental effect on interstate commerce, because, (1) it requires disposal of county-generated waste only at designated facilities, and (2) only facilities within the county have been designated. Thus, in application, the ordinance burdens commerce by precluding the transportation of county-generated waste to out-of-state facilities. Accordingly, the *Pike* analysis is applicable here.

■■ Under *Pike,* a court will strike down a regulation "only if the incidental burden on interstate commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142, 90 S.Ct. at 847. This court's conclusion is that the burden on interstate commerce does exceed the local benefit. The burden on commerce in this case is significant—no county-generated waste may be transported to a non-designated landfill; hence, no out-of-state facility may compete for this article of commerce. Although one of the local benefits of having waste disposed at one of the designated sites is the certainty of available landfill space for the ten-year life of the county plan, that benefit does not outweigh the burden on interstate commerce.

Of course, because the ordinance in this case is not facially discriminatory, as was the ordinance at issue in *Clarkstown,* this court may not engage in a review of the alternative means the state has to pursue its legitimate goals. The Court in *Clarkstown,* however, noted that Clarkstown could not

> justify the flow control ordinance as a way to steer solid waste away from out-of-town disposal sites that it might deem harmful to the environment. To do so would extend the town's police power beyond its jurisdictional bounds. States and localities may not attach restrictions to exports or imports in order to control commerce in other states.

— U.S. at ——, 114 S.Ct. at 1683.

Furthermore, as Empire notes, one of the specific purposes of the Act is to protect the economic interests of municipalities

in the Commonwealth. Section 102(a)(10) of the Act, 53 P.S. § 4000.102(a)(10).

Accordingly, this court concludes that the ordinance places an unconstitutional burden on interstate commerce and, hence, is invalid. Therefore, this court will grant Empire's motion for summary judgment seeking a declaration that the county's flow control ordinance is unconstitutional.

### 3. The Validity of the Plan and Ordinances Under the United States Solid Waste Disposal Act and the Environmental Protection Agency's Regulations

Empire contends that the plan and the county's flow-control ordinance violate the Solid Waste Disposal Act, 42 U.S.Code, §§ 6901 et seq., and federal regulations. Specifically, Empire relies upon 40 C.F.R. § 256.42(h), which provides:

The State plan should provide for substate cooperation and policies for free and unrestricted movement of solid and hazardous waste across State and local boundaries.

As indicated above, this court does not have jurisdiction in a declaratory judgment action over claims relating to the county's adoption of its solid waste management plan. Nor does this court have jurisdiction over claims relating to the county's flow-control ordinances that do not raise substantial constitutional questions. Accordingly, this court need not address this issue.

### 4. Empire and Danella's Rights Under Pre-existing Contracts

In accordance with this court's discussion above, concerning the Commerce Clause and the federal law issues Empire raises, Empire could have challenged the plan provisions in an appeal of the plan to the EHB. However, the implementing mechanism for the plan, the county's waste-flow regulations are subject to this court's review in a declaratory judgment

action alleging that the ordinance violates the Contracts Clauses of the United States and Pennsylvania Constitutions by impairing the contractual relationship between Empire and Danella.

There are two categories of contracts at issue in this case: (1) the contract between Empire and Danella; and (2) the contracts between Danella and its customers.

DER asserts (1) that the Empire/Danella contract is unenforceable and hence not protected under the Contracts Clause and (2) that although the county did not adopt its plan by ordinance until June 1, 1992, the contracts at issue, by law, incorporated the provisions of the Act. With regard to the second argument, DER contends that the legislature's adoption of the Act put landfills and haulers on notice that private contracts could be affected by county-adopted plans.

### a. Empire/Danella Contract

■ DER asserts that the Empire/Danella contract is not a valid contract, because the contract contains no element of mutual consideration. DER argues that the provision of the contract relating to the delivery of "acceptable waste" and the definition of "acceptable waste" create a tautology because section 4.01, Delivery of Acceptable Waste, requires Danella to deliver to Empire "all Acceptable Waste up to the Maximum Tonnage of Acceptable Waste for each Business Day during the Term [of the contract]." However, the term "Acceptable Waste", as defined in section 1.01 is waste "that is delivered by [Danella] to [Empire]." Thus, DER contends, the two provisions, read together, mean only that "Danella shall deliver to the landfill all waste that is delivered by Danella to the landfill." DER also points out testimony from the preliminary injunction hearing which indicates that the contract placed no minimum disposal requirements on Danella. (Tr., p. 90)

Empire contends that the contract is valid because Empire and Danella exchanged promises and have changed their

position in reliance upon the contract. Clearly, Empire has agreed to leave a certain amount of landfill space available for Danella's disposal needs. However, as DER points out, the ambiguous language of the contract does not clearly place an affirmative duty upon Danella to deliver its waste to Empire.

DER also contends that, contrary to Empire's argument, the contract does not constitute a valid requirements contract.

However, the contract apparently anticipates that Danella could have more or less waste to dispose than the amount allowed under the terms of the contract. Accordingly, the definition of the term "Acceptable Waste", by using the expression "[w]aste that is delivered . . . to the landfill" does not necessarily mean that Danella is free to ignore the contractual duty to dispose of its waste at Empire. Rather, the definition may merely be a reflection of the uncertainty on a day-to-day basis of the total amount of waste Danella may have to dispose. Accordingly, the contract can be construed to impose a mutual obligation upon Danella.

### b. Contracts Clause Protection

Although DER agrees that contracts entered into before the date the county adopted the plan for the disposal of waste, April 24, 1991, are protected under the Act, DER asserts that the Contracts Clause does not provide protection for either the Empire/Danella contract or for Danella's contracts with individuals if entered into after the effective date of the Act, thus excluding those entered into before the effective date of the flow-control ordinance. DER's argument is that Empire and Danella were aware of the Act at the time, and that, under the law of contracts, the terms of the Act became part of the contracts. Thus, DER contends that, because the Act includes specific provisions relating to grandfathering of certain contracts, and because the Act set a time period for the adoption of plans by counties, Empire and Danella's contracts are not protected.

██ DER is correct in noting that the laws that are in force at the time parties enter into a contract are merged with the other obligations that are specifically set forth in the agreement. *Walsh v. School District of Philadelphia,* 343 Pa. 178, 22 A.2d 909 (1941), *certiorari denied,* 315 U.S. 823, 62 S.Ct. 916, 86 L.Ed. 1219 (1942). Thus, a statute in force at the time of the making of a contract legally cannot impair the contract under the Contract Clause. However, statutes generally should not be applied retroactively to a contractual relationship where the application would alter existing obligations.

In the case of the contracts Danella has entered into with its customers, the ordinance at issue could affect its obligations under those contracts, because, in entering those contracts Danella obligated itself to collect and haul those customers' waste for a particular fee. In arriving at a fee to charge those customers, Danella relied upon its agreement with Empire. Certainly, with regard to the Empire/Danella contract, those two parties' obligations would be altered by retroactive application of the county's ordinance.

Similarly, Empire's contract with Danella requires it to keep a certain amount of space available for Danella's disposal purposes. The retroactive application of the law to the Empire/Danella contract would alter their contractual obligations.

██ The Contracts Clause of the United States Constitution "does not operate to obliterate the police power of the States." *Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 241–242, 98 S.Ct. 2716, 2721, 57 L.Ed.2d 727 (1978). "[T]he prohibition against impairing the obligations of contracts is not to be read literally." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 502, 107 S.Ct. 1232, 1251, 94 L.Ed.2d 472 (1987).

The Supreme Court in *Keystone Bituminous Coal Ass'n* addressed a Contracts Clause challenge to the Commonwealth's Bituminous Mine Subsidence and Land Conservation

Act and implementing regulations which precluded the coal mining petitioners from holding the surface owners to a contractual waiver of liability for surface damage. The Court first recognized that the statute operated as a significant impairment of the contractual relationship, and then noted that the next part of its review was to analyze the asserted justifications for the impairment.

The Court stated:

> [I]t is petitioners' position that, because they contracted with some previous owners of property generations ago, they have a constitutionally protected legal right to conduct their mining operations in a way that would make a shambles of all those buildings and cemeteries. As we have discussed, the Commonwealth has a strong public interest in preventing this type of harm, the environmental effect of which transcends any private agreement between contracting parties.

480 U.S. at 504–505, 107 S.Ct. at 1252.

The Court then, quoting *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 413, 103 S.Ct. 697, 705–06, 74 L.Ed.2d 569 (1983), noted that, unless the state is a party to the contract at issue, "courts should 'properly defer to legislative judgment as to the necessity and reasonableness of a particular measure.' "

■ This court has stated that statutes that are necessary for the general good of the public are constitutional even if they incidentally affect existing contractual obligations. *Cianfrani v. Com., State Employes Retirement Board*, 57 Pa.Commonwealth Ct. 143, 426 A.2d 1260 (1981), *affirmed*, 501 Pa. 189, 460 A.2d 753.

■ One of the purposes in adopting the ordinance at issue in this case was to accomplish the goals of the Act, i.e., providing for the long-term disposal of solid waste. That is a legitimate exercise of the state's police powers.

The courts of this Commonwealth have interpreted our own Contracts Clause, Art. 1, § 17, in a similar manner. In *DePaul v. Kauffman*, 441 Pa. 386, 272 A.2d 500 (1971) the Pennsylvania Supreme Court quoted from *Zeuger Milk Co. v. Pittsburgh School District*, 334 Pa. 277, 5 A.2d 885, 886 (1939), as follows:

> The constitutional protection of the obligation of contracts is necessarily subject to the police power of the state, and therefore a statute passed in the legitimate exercise of the police power will be upheld by the courts, although it incidentally destroys existing contract rights.

441 Pa. at 399, 272 A.2d at 506–507.

That position is also supported by the Pennsylvania Superior Court's decision in *Nuttall v. Nuttall*, 386 Pa. Superior Ct. 148, 562 A.2d 841 (1989), *petition for allowance of appeal granted*, 525 Pa. 584, 575 A.2d 115 (1990), in which that court held that the retroactive application of the equitable distribution provision of the divorce laws was a legitimate exercise of the state's police powers, and application of the law to property acquired before the law was adopted did not constitute an impairment on the husband's contractual rights.

However, in *First National Bank of Pennsylvania v. Flanagan*, 515 Pa. 263, 528 A.2d 134 (1987), the Pennsylvania Supreme Court concluded that a statute adopted after private parties entered into a contract could not abridge the rights under the earlier contract. The court noted that, if it were to apply the new law, the contractual obligations would be altered, and hence, application would result in an unconstitutional impairment of the contract.

■ Clearly, in this case, contracts entered into before the adoption of the Act are protected by the Contracts Clause, under *First National Bank*. However, as noted above, DER asserts that contracts entered into after the effective date of the Act and before the effective date of the flow-control ordinances, are not protected because the Act was incorporated into the contracts and gave Empire and Danella notice that

they might not be free to enter into contracts because counties could designate landfills other than Empire.

However, although the Act directed that counties should adopt a plan within a particular time period, private parties had no definite way of knowing when a plan would ultimately be approved by DER. DER's view is not reasonable because of the uncertainty with regard to the length of time it could take for a county to develop a plan and have DER approve the plan. Hence, the effective date of the implementing ordinances is the date from which private parties should be precluded from entering disposal contracts. Accordingly, in this case, contracts Empire and Danella entered into before the effective date of the implementing county ordinances are protected.

## *ORDER*

NOW, June 30, 1994, the motion for summary judgment filed by the Department of Environmental Resources, Lehigh County and Lehigh County Department of Planning and Development, Office of Solid Waste Management, is granted with regard to Empire and Danella's claims challenging the Act and the county's solid waste management plan provisions adopted pursuant to the Act. The motion for summary judgment filed by Empire Sanitary Landfill and Danella Environmental Technologies, Inc., is granted with regard to the request for a declaratory judgment that Lehigh County's flow control ordinance is invalid under the Commerce Clause and the Contracts Clause of the United States Constitution.